SIGNATURE DEVELOPMENT, LLC, PLAINTIFF v. SANDLER
COMMERCIAL AT UNION, L.L.C., DEFENDANT

No. COA09-646

(Filed 2 November 2010)

**1. Appeal and Error— interlocutory order—immediately appealable—certified under Rule 54(b)—affected a substantial right**

The Court of Appeals considered the merits of plaintiff's appeal from an interlocutory order partially granting defendant's motion to dismiss in a breach of contract case. The trial court certified the order under Rule 54(b) of the Rules of Civil Procedure

and the order affected a substantial right because the same factual issues were involved in the claims which were dismissed and the claims which remained and if the appeal was not immediately heard, different juries could reach different results thereby rendering inconsistent verdicts on the same factual issues.

## 2. Construction Claims— breach of contract—general contractor—control test—erroneous dismissal

The trial court erred in partially granting defendant's motion to dismiss in a breach of contract case based on the trial court's finding that plaintiff was an unlicensed general contractor. Plaintiff did not exercise the requisite control over a development project to be considered a general contractor and thus was not required to be licensed under N.C.G.S. § 87-1.

## 3. Construction Claims— breach of contract—general contractor—control test—action not dismissed

Defendant's arguments that the trial court's order partially dismissing plaintiff's complaint in fact dismissed plaintiff's entire complaint or, in the alternative, that the trial court erred by failing to dismiss plaintiff's complaint in its entirety were not addressed because the Court of Appeals concluded that the trial court erred in partially dismissing plaintiff's complaint.

## 4. Liens— materialman's lien—not attached for lost profits

The trial court did not err in striking plaintiff's claim of lien against the property at issue because a materialman's lien does not attach for lost profits.

## 5. Attachment— erroneous dissolution—not related to claim of lien—action pending

The trial court erred in dissolving an order of attachment obtained by plaintiff pursuant to N.C.G.S. § 1-440.3 because the order was not related to a stricken claim of lien and plaintiff's breach of contract action was pending.

## 6. Attachment— application for dissolution—remanded

Appellee Wells Fargo's application to dissolve an order of attachment obtained by plaintiff was remanded to the trial court because the trial court did not rule on the application.

SIGNATURE DEV. LLC v. SANDLER COMMERCIAL AT UNION, L.L.C.

[207 N.C. App. 576 (2010)]

Appeal by Plaintiff from order entered 28 January 2009 by Judge Christopher M. Collier in Union County Superior Court. Heard in the Court of Appeals 18 November 2009.

*Rayburn Cooper & Durham, P.A., by James B. Gatehouse, David S. Melin, and Daniel J. Finegan, for Plaintiff-Appellant.*

*Johnston, Allison & Hord, P.A., by Gary J. Welch and Daniel A. Merlin, for Defendant-Appellee.*

*Troutman Sanders, LLP, by Gavin B. Parsons and D. Kyle Deak, for Applicant-Appellee Wells Fargo Bank, National Association.*

*Horack Talley Pharr & Lowndes, P.A., by John W. Bowers, for The National Association of Industrial and Office Properties, NC Chapter, Amicus Curiae.*

STEPHENS, Judge.

The paramount issue is whether the trial court erred in partially granting Defendant's motion to dismiss based on the general contractor licensing law. For the reasons stated herein, we reverse the order of the trial court.

*I. Procedural History and Factual Allegations*

On 28 January 2005, Plaintiff Signature Development, LLC ("Plaintiff," "Signature," or "Project Manager") and Defendant Sandler Commercial at Union, L.L.C. ("Defendant," "Sandler," or "Owner") entered into a Development Management Agreement ("Agreement") concerning the development of Sandler's sixteen acres of property in Union County, North Carolina ("Property") into a retail complex ("Project"). The Project, to be known as Cureton Town Center, was to be completed in three phases, with the initial phase consisting of the development of a grocery store parcel and four outparcels ("Initial Phase").

Under the Agreement, Sandler, designated as "Owner," engaged Signature as "Project Manager" for the Initial Phase. As Project Manager, Signature "either directly or through subcontractors, employees or agents approved in writing by Owner, shall act as Owner's agent in the management, construction management, development, marketing and leasing coordination of the Project." The Agreement further provides that as Project Manager, Signature shall perform all project management services "subject to the general direction, control and approval of Owner[.]" In exchange for

Signature's project management services, the Agreement provides that Sandler pay Signature certain fees, including an Initial Development Fee, a Base Development Fee, a Leasing Fee, a Sales Fee, and a Participation Fee.

According to Signature, it has satisfied its obligations under the Agreement and the Project is now over 95% leased, with Harris Teeter as its anchor tenant and ground leases to Sun Trust and First Charter. Sandler has paid Signature the Base Development Fee, Leasing Fees, and Sales Fees.[1] However, Sandler has failed to pay Signature the Participation Fee, which Signature estimates to be not less than $2,338,806.

On 8 August 2008, pursuant to Chapter 44A of the North Carolina General Statutes, Signature filed in Union County Superior Court a claim of lien on the Property to secure the $2,338,806 debt allegedly owed to Signature by Sandler. On 12 August 2008, Signature filed a complaint against Sandler seeking, *inter alia*: damages for breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, fraud, negligent misrepresentation, and unfair and deceptive trade practices; an order for prejudgment attachment pursuant to N.C. Gen. Stat. § 1-440.1, *et seq.*; an accounting and the imposition of a constructive trust; and perfection of its 8 August 2008 claim of lien.

On 28 August 2008, Signature procured an order of attachment in the amount of $2,338,806 against the Property. Also on that date, Signature filed a notice of *lis pendens* with regard to the Property.

On 3 September 2008, Signature caused to be issued summonses of garnishee and notices of levy upon individuals and entities believed to be in possession of Sandler's property, primarily retail tenants in the Cureton Town Center, and banks, including Applicant-Appellee Wells Fargo Bank, National Association ("Wells Fargo").[2]

On 25 September 2008, Wells Fargo filed an Application to Dissolve and/or Modify Order of Attachment ("Application") seeking, *inter alia*, dissolution or modification of the 28 August 2008 order of attachment. Wells Fargo alleged that it had first and second priority

---

1. The Initial Development Fee of $47,725 was to be paid to Signature "[c]ontemporaneously with the execution of [the] Agreement[.]" Signature does not allege in its complaint that this fee has not been paid.

2. Beginning in December 2005, Wells Fargo took a series of deeds of trust from Sandler which were secured by the Property. By virtue of those deeds of trust, Wells Fargo has over 12 million dollars invested in the Property.

lien rights to the rent payments from the tenants of Cureton Town Center and that Signature was interfering with Wells Fargo's rights in those monies by means of the order of attachment and garnishment summons.

On 7 October 2008, Sandler filed a motion to dismiss pursuant to Rule 12(b)(6). Sandler alleged that Signature's complaint, with the attached Agreement, revealed that Signature was a "general contractor" under N.C. Gen. Stat. § 87-1, that the trial court "may take judicial notice that Signature is <u>not</u> a licensed general contractor," and that under North Carolina law, unlicensed general contractors are barred from recovering monies from a property owner "on <u>any</u> claim[.]" Thus, Sandler moved the trial court to dismiss all Signature's claims, dissolve the order of attachment and release the garnishees, cancel the claim of lien, and order any funds paid into the court by virtue of the order of attachment to be given to Sandler immediately.

Wells Fargo's Application and Sandler's Motion to Dismiss were heard on 27 October 2008. By order entered 28 January 2009, the trial court partially granted Sandler's motion to dismiss, struck Signature's claim of lien, and dissolved the order of attachment. The trial court further ordered Signature to provide an accounting of all amounts received by virtue of the order of attachment and to forward such receipts to Wells Fargo.

From the trial court's order, Signature appeals.[3]

## II. Discussion

### A. Grounds for Appellate Review

[1] As a threshold issue, we must determine whether the trial court's order in this case is immediately appealable. An order which does not dispose of all claims as to all parties in an action is interlocutory. *Cunningham v. Brown*, 51 N.C. App. 264, 267, 276 S.E.2d 718, 722 (1981). Ordinarily, there is no right of appeal from an interlocutory order. *CBP Resources, Inc. v. Mountaire Farms, Inc.*, 134 N.C. App. 169, 170, 517 S.E.2d 151, 153 (1999). However, an interlocutory order may be immediately appealed "(1) if the order is final as to some but not all of the claims or parties and the trial court certifies there is no just reason to delay the appeal pursuant to N.C. R. Civ. P. 54(b) or (2) if the trial court's decision deprives the appellant of a substantial right which would be lost absent immediate review." *Id.* at 171, 517 S.E.2d at 153 (citations and quotation marks omitted).

---

3. On 25 February 2009, the trial court entered an order staying execution of the 28 January 2009 order pending this appeal.

SIGNATURE DEV. LLC v. SANDLER COMMERCIAL AT UNION, L.L.C.

[207 N.C. App. 576 (2010)]

When an appeal is from an order that is final as to one party, but not all, and the trial court has certified the matter under Rule 54(b), this Court must review the issue. *James River Equip., Inc. v. Tharpe's Excavating, Inc.*, 179 N.C. App. 336, 340, 634 S.E.2d 548, 552, *disc. review denied and appeal dismissed*, 361 N.C. 167, 639 S.E.2d 650 (2006). However, when an appeal is from an order which is not final as to any party (*e.g.*, one which disposes of some but not all claims against a party), "the trial court's determination that there is 'no just reason for delay' of appeal, while accorded deference, cannot bind the appellate courts[.]" *Anderson v. Atlantic Cas. Ins. Co.*, 134 N.C. App. 724, 726, 518 S.E.2d 786, 788 (1999) (internal citation omitted).

In this case, the trial court certified that the order partially granting Sandler's motion to dismiss was a "final judgment as to one or more of Plaintiff's claims, and that there is no just reason for delay, and that it therefore constitutes a final judgment pursuant to Rule 54(b)." However, because the order on appeal disposes of some but not all claims against Sandler, the trial court's Rule 54(b) certification is not binding on this Court, and we must determine whether a substantial right would be affected absent immediate appeal of the interlocutory order.

The "substantial right" test for appealability of interlocutory orders is that "the right itself must be substantial and the deprivation of that substantial right must potentially work injury to [appellant] if not corrected before appeal from final judgment." *Goldston v. American Motors Corp.*, 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990). Generally, we must determine if a substantial right is affected "by considering the particular facts of that case and the procedural context in which the order from which appeal is sought was entered." *Waters v. Qualified Personnel, Inc.*, 294 N.C. 200, 208, 240 S.E.2d 338, 343 (1978).

In this case, the trial court found that "as an unlicensed contractor Plaintiff Signature cannot sue for monies owed under provisions 3(a) and (b) of the Development Management Agreement, that it appears that the compensation for these construction/development obligations is described in paragraph 4(a) and (b) of the Agreement, and that Defendant's Motion to Dismiss those claims should be allowed." The trial court further found that "accordingly, the lien placed on the [P]roperty by Plaintiff should be stricken and the related attachment order dissolved . . . ." The same factual issues are involved in the claims based on provisions 3(a), 3(b), 4(a), and 4(b) of the Agreement

which were dismissed and in Signature's claims based on the remaining provisions of the Agreement. If the present appeal is not immediately heard, it is possible that different juries could reach different results thereby rendering inconsistent verdicts on the same factual issues. As the right to avoid the possibility of two trials on the same issues is a substantial right, *Green v. Duke Power Co.*, 305 N.C. 603, 608, 290 S.E.2d 593, 596 (1982), the partial grant of Sandler's motion to dismiss affects a substantial right which would be prejudiced if this action was not immediately appealable. Accordingly, we will reach the merits of this appeal.

### B. Motion to Dismiss

[2] Signature argues that the trial court erred in partially granting Sandler's motion to dismiss based on the trial court's finding that Signature was an unlicensed general contractor. We agree.

### 1. Standard of Review

A motion to dismiss under N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) for failure to state a claim upon which relief may be granted tests the legal sufficiency of the complaint. *Isenhour v. Hutto*, 350 N.C. 601, 604, 517 S.E.2d 121, 124 (1999). In ruling on the motion, "the allegations of the complaint must be viewed as admitted, and on that basis the court must determine as a matter of law whether the allegations state a claim for which relief may be granted." *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979). Dismissal is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face that some fact essential to plaintiff's claim is missing; and (3) when some fact disclosed in the complaint defeats the plaintiff's claim." *Schloss Outdoor Advertising Co. v. Charlotte*, 50 N.C. App. 150, 152, 272 S.E.2d 920, 922 (1980). Moreover, "[w]hen the complaint states a valid claim but also discloses an unconditional affirmative defense which defeats the asserted claim, . . . the motion will be granted and the action dismissed." *Skinner v. E. F. Hutton & Co.*, 314 N.C. 267, 270, 333 S.E.2d 236, 238 (1985). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *Leonard v. Pugh*, 86 N.C. App. 207, 209, 356 S.E.2d 812, 814 (1987). On appeal of a trial court's ruling on a 12(b)(6) motion to dismiss, our Court "conducts a *de novo* review of the pleadings to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct." *Page v. Lexington*

*Ins. Co.*, 177 N.C. App. 246, 248, 628 S.E.2d 427, 428 (2006) (citation and quotation marks omitted).

### 2. *Propriety of the Trial Court's Order as to Signature*

A "general contractor" is defined by N.C. Gen. Stat. § 87-1 as

> any person or firm or corporation who for a fixed price, commission, fee, or wage, . . . undertakes to superintend or manage, on his own behalf or for any person, firm, or corporation that is not licensed as a general contractor pursuant to this Article, the construction of any building, highway, public utilities, grading or any improvement or structure where the cost of the undertaking is thirty thousand dollars ($30,000) or more[.]

N.C. Gen. Stat. § 87-1 (2009). One who undertakes a project as a general contractor in North Carolina is required to comply with the licensing requirements set forth in N.C. Gen. Stat. § 87-10. That statute requires

> an examination, either oral or written, of all applicants for license to ascertain, for the classification of license for which the applicant has applied: (i) the ability of the applicant to make a practical application of the applicant's knowledge of the profession of contracting; (ii) the qualifications of the applicant in reading plans and specifications, knowledge of relevant matters contained in the North Carolina State Building Code, knowledge of estimating costs, construction, ethics, and other similar matters pertaining to the contracting business; (iii) the knowledge of the applicant as to the responsibilities of a contractor to the public and of the requirements of the laws of the State of North Carolina relating to contractors, construction, and liens[.]

N.C. Gen. Stat. § 87-10(b) (2009). The express language of N.C. Gen. Stat. § 87-10 indicates that it is designed to ensure competence within the construction industry. *Brady v. Fulghum*, 309 N.C. 580, 584, 308 S.E.2d 327, 330 (1983). "By requiring this examination, the legislature seeks to guarantee skill, training and ability to accomplish such construction in a safe and workmanlike fashion." *Id.* (citation and quotation marks omitted).

A general contractor's failure to procure a license constitutes a misdemeanor. N.C. Gen. Stat. § 87-13 (2009). Furthermore, although the statute does not expressly preclude an unlicensed contractor's

suit against an owner for breach of contract, the North Carolina Supreme Court held in *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 162 S.E.2d 507 (1968), that the contractor may not recover on the contract or in *quantum meruit* when he has ignored the protective statute. "[T]he reason for this 'bright line' 'harsh' rule is to protect the public from incompetent builders . . . ." *Dellinger v. Michal*, 92 N.C. App. 744, 747, 375 S.E.2d 698, 699, *disc. review denied*, 324 N.C. 432, 379 S.E.2d 240 (1989).

In determining whether a party is a general contractor, we must "determine the extent of [the party's] control over the entire project." *Mill-Power Supply Co. v. CVM Assocs.*, 85 N.C. App. 455, 461, 355 S.E.2d 245, 249 (1987). As this Court noted in *Helms v. Dawkins*, 32 N.C. App. 453, 232 S.E.2d 710 (1977), *overruled on other grounds*, *Sample Const. Co. v. Morgan*, 311 N.C. 717, 722-23, 319 S.E.2d 607, 611 (1984),

[n]ot every person who undertakes to do construction work on a building is a general contractor, even though the cost of his undertaking exceeds $30,000.00. . . . [T]he principal characteristic distinguishing a general contractor from a subcontractor or other party contracting with the owner with respect to a portion of the project, or a mere employee, is the degree of control to be exercised by the contractor over the construction of the entire project.

*Id.* at 456, 232 S.E.2d at 712 (internal citations omitted). "Under the *Helms* 'control test,' we ordinarily look to the terms of the contract to determine the degree of control exercised by a particular contractor over the entire project." *Mill-Power Supply Co.*, 85 N.C. App. at 461, 355 S.E.2d at 249. "[A] general contractor is one with control over a construction project." *Duke Univ. v. Am. Arbitration Ass'n*, 64 N.C. App. 75, 80, 306 S.E.2d 584, 587, *disc. review denied*, 309 N.C. 819, 310 S.E.2d 349 (1983).

In *Miley v. H.C. Barrett & Assocs.*, No. COA01-720, 2002 N.C. App. LEXIS 2167 (May 21, 2002), this Court considered the terms of a contract between plaintiff ("HCB") and defendant ("Owners") to determine if HCB had acted as a general contractor. Although, as an unpublished case, *Miley* does not establish binding legal precedent, we are persuaded by this Court's reasoning in that case. *See State v. Farmer*, 158 N.C. App. 699, 705, 582 S.E.2d 352, 356 (2003) ("[A]lthough not controlling law, we are persuaded by an earlier unpublished opinion of this Court in which we addressed a similar set of circumstances . . . ."). The pertinent provisions of the contract in *Miley* stated:

1. HCB agrees to supervise and co-ordinate the construction of a dwelling house for the Owners at the address referred to in this agreement pursuant to the plans and specifications attached to this agreement with the understanding that the Owners may make any and all changes to the plans and specifications as the Owners deem appropriate from time to time.

* * * *

4. The relationship between Owners and HCB shall be that of Owners and subcontractor.

5. It is anticipated that HCB will negotiate in its own name contracts for labor and materials for the construction of the dwelling house. However, it is strictly understood that HCB is acting as agent for the Owners and that all contracts for labor, materials and supplies are entered into for and on behalf of the Owners, and it is further understood that where practical Owners may be involved in contract negotiations and that where possible, Owners will co-sign contracts along with HCB.

6. It is agreed that Owners will be responsible for all costs of construction of the dwelling, including but not limited to all costs of materials, labor, Builders Risk Insurance thru [sic] HCB's policy, Workman's Compensation Insurance as required, all losses by theft, fire or other causes and all errors or omissions during the construction of the dwelling. In the event of errors or omissions, HCB will exercise its best efforts to correct the situation through the Owner[s'] subcontractor or vendor causing said error or omission.

* * * *

8. All invoices or work, labor and materials due to all contractors shall be paid by Owners when due. HCB will inspect and provide approved invoices to Owners after receipt by HCB. By the 1st day of each month following the date any invoice is due, Owners will provide to HCB in writing their certification by specific reference thereto that all due invoices have been paid. . . .

* * * *

e) In no event shall HCB be responsible for or obligated to pay for any errors or omissions in the construction of the dwelling house and in no event shall the Owners be entitled to setoff for such errors or omissions against the fees due to HCB pursuant to the agreement.

*Id.* at *10-12. After considering the contractual provisions, this Court concluded that "HCB served as a construction manager under a pure construction management arrangement; HCB was neither a general contractor nor a builder of plaintiffs' home." *Id.* at *13. This conclusion was "reinforced by the fact that HCB acted solely as plaintiffs' agent, had no control over the manner in which the construction project was actually performed, and assumed no responsibility for costs, timeliness, or quality of the project." *Id.*

In this case, the pertinent aspects of the Agreement between Sandler and Signature are as follows:

WHEREAS, Owner desires to engage the Project Manager to provide general management, development, construction management, marketing, and leasing coordination services in connection with the Initial Phase (hereinafter in this Agreement the Initial Phase shall be referred to as the "Project"), and the Project Manager desires to provide such services on the terms and conditions set forth in this Agreement.

. . . .

1. Engagement of the Project Manager. Owner hereby engages the Project Manager as an independent contractor to provide the services described in this Agreement relating to management, development, construction, marketing and leasing coordination with respect to the Project . . . .

. . . .

3. Services to be Performed. Owner shall provide, in a timely manner, adequate funding to cover all approved costs and expenses incurred by Project Manager in the performance of its duties hereunder. The Project Manager, either directly or through subcontractors, employees or agents approved in writing by Owner, shall act as Owner's agent in the management, construction management, development, marketing and leasing coordination of the Project. In carrying out its responsibilities pursuant to this Agreement, Project Manager shall have authority to enter into contracts on behalf of Owner . . . of . . . $50,000[] or less, provided that no individual contractor or vendor shall receive more than one (1) contract with a cumulative total in excess of . . . $50,000[] without Owner's prior consent; provided, however, at Project Manager's request, Owner shall timely execute any such contracts that Owner approves. Owner must approve (and will timely execute) all other contracts

to be awarded for the Project . . . . The Project Manager shall, subject to the general direction, control and approval of Owner, and subject to timely payment of all applicable costs and expenses by Owner as herein described, perform the following services:

a. Planning Function. The Project Manager shall provide planning and processing services to secure all governmental and other required approval for implementation of the Project. Such services shall include, but not be limited to, the following:

i. Obtain plans and specifications . . . for the development and construction of the Project which are satisfactory to and are approved by Owner.

ii. Procurement of all . . . required licenses, permits, bonds and/or approvals required for development and construction of the Project . . . .

iii. Coordination of geotechnical, engineering and architectural services to be performed by professional consultants to secure the necessary permits and approvals . . . .

b. Development and Construction Function. The Project Manager shall provide services for the coordination and project management of all land development and construction items related to the Project including, but not limited to, the following (provided Owner shall approve prior to engagement each architect's, engineer's and contractor's financial responsibility).

i. Pursue development and construction of the Project in accordance with the Plans and Specifications.

ii. Competitively bid and/or negotiate contracts and recommend to Owner for Owner's approval award of contracts to financially responsible architects, engineers, general contractors and others for the completion of infrastructure and construction of the Project. All contracts shall be in the name of Owner, and once approved by Owner, may be executed by the Project Manager on behalf of Owner. All contracts shall require that the architect, engineer or contractor has adequate and proper insurance with companies and in amounts satisfactory to Owner, providing insurance coverage for both Project Manager and Owner.

iii. Using approved architects, engineers and contractors, oversee and enforce completion of infrastructure within the Project and approval of infrastructure by local, county and state agencies.

iv. Using approved engineers, architects and contractors, oversee, direct and coordinate the work of construction of the Project and installation of all utilities required for the Project.

v. Procure all lien waivers and releases of liens from any and all architects, engineers, contractors, subcontractors and material suppliers who perform labor and/or provide materials to the Project.

vi. Oversee the prompt completion of repairs required for final local, county and state inspections of the Project and obtain certificates of occupancy for the Project.

vii. Secure approval of such bonds and permits, as may be required . . . .

. . . .

xii. Instruct and monitor all agents, employees, contractors and invitees who enter the Project as to all safety requirements, and report any unsafe conditions or actions immediately to Owner.

xiii. Take commercially reasonable steps to protect the Project, including all construction, from and against loss or damage from any cause and be responsible for all parts of the construction, temporary and permanent, whether finished or not, including all materials delivered to the Project, until final completion, as determined by Owner. . . .

c. <u>Leasing and Marketing Function.</u> The Project Manager shall act as the Master Leasing Agent for the Project and shall coordinate leasing and marketing of the Project, including, but not limited to, the following:

i. Project Manager shall at the request of Owner devise and implement a leasing and marketing program for the Project.

ii. Project Manager shall oversee all leasing and land sales to obtain leases or sales agreements with tenants or owners occupying 10,001 square feet or more of retail space within the Project other than within any outparcel ("Anchor Tenants") and tenants or owners occupying an outparcel at the Project ("Outparcel Tenants"). All leases and sales contracts for and with Anchor Tenants and Outparcel Tenants shall be subject to Owner's approval and shall be executed by Owner.

iii. Project Manager shall negotiate an agreement with First Colony Corporation ("First Colony") or another leasing agent approved by Owner to lease space at the Project . . . and to manage the Project once certificates of occupancy have been issued permitting the first tenant to occupy the Project. The leasing agreement with First Colony and the management agreement with First Colony shall be subject to Owner's approval, shall be executed by Owner and shall provide that Owner can terminate each agreement upon thirty (30) days prior notice . . . .

d. <u>Property Management Function</u>. Until such time as a management agreement has been entered· into with First Colony or another management company, the Project Manager shall provide general property management services, including but not limited to, the following:

i. Periodic inspection of the Property . . . .

ii. With use of outside counsel reasonably acceptable to Owner, establish Covenants, Conditions and Restrictions and cross-easement agreements necessary for the operation of the Project.

. . . .

4. <u>Compensation</u>. For and in consideration of Project Manager's services under this Agreement, Owner agrees to pay Project Manager the following amounts:

a. Contemporaneously with the execution of this Agreement, the amount of . . . $47,725.00[] (the "Initial Development Fee").

b. A fee (the "Base Development Fee") equal to . . . 2 1/2%[] of the costs incurred by Owner to develop and construct the Project subsequent to the date of execution of this Agreement, excluding from such costs the Initial Development Fee, the Base Development Fee, interest carry, financing costs and land contribution value (the "Base Project Cost") . . . .

c. Owner shall pay Project Manager a leasing fee (the "Leasing Fee") for [procuring leases to Anchor Tenants and Outparcel Tenants].

d. If an Outparcel Tenant·purchases its site rather than leases its site, the Project Manager shall receive a sales fee (the "Sales Fee") . . . .

    e. A fee equal to twenty percent (20%) of the net profits (the "Net Profits") realized and distributed by Owner from the sale, financing, refinancing and/or operation of the Project (the "Participation Fee").

The Agreement unambiguously vested control over the entire Project with Sandler. The Agreement further unambiguously provided that Signature's performance of its project management services was "subject to the general direction, control and approval of Owner" and that, similar to HCB, Signature was to "act as Owner's agent in the management, construction management, development, marketing and leasing coordination of the Project." By the terms of the Agreement, Sandler retained control of all costs associated with the Project, including expenses incurred by Signature. While Signature was given authority to enter into contracts for $50,000 or less, subject to certain conditions, Signature did so "on behalf of Owner" and all other contracts had to be approved and executed by Sandler. Sandler also retained control over the approval of "architects, engineers, general contractors, and others" hired for the Project. Additionally, all contracts associated with the project were to be in Sandler's name, and Sandler was to approve all plans and specifications. By the terms of the Agreement, Signature, like HCB, assumed no responsibility for costs, timeliness, or quality of the project. After considering the contractual provisions in the Agreement at issue here, we conclude that Signature was not a general contractor but, rather, served as Sandler's agent under a pure project management arrangement.

    Sandler argues further, however, that the terms of the Agreement "clearly show[] that Signature [] controlled the project[.]" In support of this contention, Sandler highlights certain terms of the Agreement which outline Signature's planning, development, and construction management duties. However, Sandler fails to acknowledge that, by the express terms of the Agreement, Signature was only to "act as Owner's agent in the management, construction management, development, marketing and leasing coordination of the Project" and that Signature's performance of its project management duties was "subject to the general direction, control and approval of Owner[.]"

    Sandler also argues that Signature's "responsibilities encompass the very definition of a construction manager, who when controlling a construction project, *must* be properly licensed[,]" and relies on *Duke Univ. v. Am. Arbitration Ass'n* for its "holding that the construction manager controlled the project and therefore was the 'general manager' of the project and needed to be licensed[.]" Sandler's argument misses the mark.

Initially, we note that while N.C. Gen. Stat. § 87-1 requires that a "general contractor" be licensed, it does not govern license requirements of a "project manager" or a "general manager." Indeed, neither party has argued that a "project manager" or a "general manager" must be licensed according to statute. Moreover, Sandler misstates the holding in *Duke*. In *Duke*, this Court held that defendant, a contractor who contracted directly with the owner to fabricate and erect the stucco wall panel system of Duke Hospital North and to perform related lath and plastering work, was not a general contractor under N.C. Gen. Stat. § 87-1. This Court based its conclusion on the fact that defendant "did not undertake to build the hospital in its entirety, nor did it undertake to improve an already existing building." *Duke*, 64 N.C. App. at 78, 306 S.E.2d at 586. Furthermore, "[d]efendant had control solely over construction of the stucco wall panel system and related lath and plastering work; it had no control over the work of other contractors nor over the construction project as a whole." *Id.* at 79, 306 S.E.2d at 586. Although this Court noted that "[d]efendant's work was subject to the approval of the construction manager" who had been hired by the owner to supervise the construction project, and that "[t]he supervision of the construction manager over each separate trade contractor was ample protection for [the owner] against the possible incompetency of any of its trade contractors[,]" *id.* at 80, 306 S.E.2d at 587, contrary to Sandler's contention, whether the manager who was hired to supervise the proj-ect had a general contractor's license was not at issue in the case.

Sandler additionally cites the following language from Title 21, chapter 12, section .0208(a) of the North Carolina Administrative Code in support of its contention that Signature is a general contractor:

The term "undertakes to superintend or manage" as used in [N.C. Gen. Stat. §] 87-1 to describe a person, firm or corporation deemed to be a general contractor means that the person, firm, or corporation is responsible for superintending or managing the entire construction project, and . . . is compensated for superintending or managing the project based upon the cost of the project or the time taken to complete the project. Such person, firm, or corporation must hold a general contracting license in the classifications and limitation applicable to the construction of the project.

21 N.C. Admin. Code 12.0208(a) (2009). Sandler contends that Signature's complaint and the terms of the Agreement indicate that Signature was "responsible for superintending or managing the entire construction project." We disagree.

Consistent with prior case law and our analysis in this case, whether a "person, firm, or corporation is responsible for superintending or managing the entire construction project" is determined under "the *Helms* 'control test[.]' " *Mill-Power Supply Co.*, 85 N.C. App. at 461, 355 S.E.2d at 249. As explained *supra*, the terms of the Agreement do not indicate that Signature held the requisite control over the Project to be classified as a general contractor and, instead, indicate that Signature served solely as Sandler's agent under a pure project management arrangement.

Moreover, our interpretation of N.C. Gen. Stat. § 87-1 and section .0208(a) under the "control test" is fully supported by a recent amendment to section .0208(a) which states:

(b) The term "undertakes to superintend or manage" described in Paragraph (a) of this Rule does not include the following:

. . . .

(2) subject to the conditions stated within this Subparagraph and Paragraph (c), any person, firm, or corporation retained by an owner of real property as a consultant, agent, or advisor to perform development-related functions, including:

(A) assisting with site planning and design,

(B) formulating a development scheme,

(C) obtaining zoning and other entitlements,

(D) tenant selection and negotiation,

(E) interfacing and negotiating with the general contractor, engineer, architect, other construction and design professionals and other development consultants with whom the land owner separately contracts, including, negotiating contracts on the owner's behalf, assisting with scheduling issues, ensuring that any disputes between such parties are resolved to the owner's satisfaction, and otherwise ensuring that such parties are proceeding in an efficient, coordinated manner to complete the project,

(F) providing cost estimates and budgeting,

(G) monitoring the progress of development activities performed by other parties,

(H) arranging and negotiating governmental incentives and entitlements, and

(I) selecting and sequencing sites for development.

(c) The exclusions set forth in Subparagraph (b)(2) do not apply, however, unless the following conditions are satisfied:

(1) the owner has retained a licensed general contractor or licensed general contractors to construct the entire project or to directly superintend and manage all construction work in which the person, firm or corporation has any involvement and which would otherwise require the use of a licensed general contractor, and

(2) the use of the person, firm or corporation will not impair the general contractor's ability to communicate directly with the owner and to verify the owner's informed consent and ratification of the directions and decisions made by the person, firm or corporation to the extent that such directions or decisions affect the construction activities otherwise requiring the use of a licensed general contractor.

21 N.C. Admin. Code 12.0208 (Cumm. Supp. Aug. 2010).

This amendment became effective after the complaint in this case was filed and, thus, does not impact the outcome of this case. Nonetheless, the clear intent behind the amendment is to formalize the "control test" and to clearly exclude from the general contractor licensing requirements a party who, like Signature, contracts with the owner to perform the "development-related functions" enumerated in the amendment on a project where, as here, the owner retained a licensed general contractor to perform the general contractor role.[4]

Taking the allegations of the complaint in the light most favorable to Signature, it appears to this Court that Sandler engaged Signature not to perform the work of a general contractor in the construction of the Project, but to act as Sandler's agent in the day-to-day management of the Project; that Signature satisfactorily completed its duties under the Agreement; and that Sandler has failed to pay Signature the Participation Fee as required by the Agreement. As this Court has noted, "[t]he licensing statutes should not be used as a shield to avoid a just obligation owed to an innocent party." *Zickgraf Enters., Inc. v. Yonce*, 63 N.C. App. 166, 168, 303 S.E.2d 852, 852 (1983).

4. We note that the project management services Signature contracted with Sandler to provide under the Agreement are strikingly similar to the "development-related functions" described in the amendment.

Sandler nonetheless claims that "Signature [] is not 'innocent' by the plainest meaning of the word [because] Signature [] had the ability and opportunity to obtain a license with the North Carolina Licensing Board of General Contractors, but chose not to." Sandler further opines that "[a]lthough the consequences are harsh, they are consequences which Signature [] brought on itself by not simply obtaining a general contractor's license." We strongly disagree with Sandler's position.

As thoroughly explained, *supra*, Signature was not a general contractor on the Project and, thus, was not required to obtain a general contractor's license. Moreover, based on the record before this Court, it appears that Sandler's failure to pay Signature the Participation Fee was not the result of Signature's choice not to obtain a general contractor's license, or any incompetent work performed by Signature, but, instead, was a direct result of Sandler's having inadequate financial resources to meet its obligations under the Agreement, a condition which Signature certainly did not bring upon itself. Additionally, while Sandler was well within its rights as the owner to retain full control over the Project, Sandler may not now attempt to claim it is entitled to be "protected" from Signature by N.C. Gen. Stat. § 87-1, especially when the general contractor actually hired by Sandler was ample protection for Sandler against the possible incompetency of any of its contractors.

We thus conclude that under the circumstances of this case, it was inappropriate for the trial court to dismiss Signature's claims on Sandler's Rule 12(b)(6) motion. We reverse the trial court's order on this issue.

[3] Sandler argues that the trial court's order, in fact, dismissed Signature's complaint "in its entirety" because payment of the Participation Fee was based on Signature's services provided pursuant to provisions 3(a) and (b) of the Agreement. However, because we conclude that the trial court erred in dismissing Signature's claims under those provisions, we need not address Sandler's argument. By way of cross-appeal, Sandler alternatively argues that the trial court erred by failing to dismiss Signature's lawsuit "in its entirety" because Signature was an unlicensed general contractor. However, because we conclude that the trial court erred in finding and concluding that Signature was an unlicensed general contractor, and in partially dismissing Signature's claims on this basis, it necessarily follows that the trial court did not err by failing to dismiss Signature's lawsuit "in its entirety" on the basis that Signature was an unlicensed general contractor. Accordingly, we reject Sandler's argument.

## C. Claim of Lien

[4] Signature next argues that the trial court erred in striking its claim of lien against the Property. We disagree.

Pursuant to N.C. Gen. Stat. § 44A-8,

[a]ny person who performs or furnishes labor or professional design or surveying services or furnishes materials or furnishes rental equipment pursuant to a contract, either express or implied, with the owner of real property for the making of an improvement thereon shall . . . have a right to file a claim of lien on the real property to secure payment of all debts owing for labor done or professional design or surveying services or material furnished or equipment rented pursuant to the contract.

N.C. Gen. Stat. § 44A-8 (2009). The primary purpose of the lien statute is "to protect laborers and materialmen who expend their labor and materials upon the buildings of others." *Carolina Bldrs. Corp. v. Howard-Veasey Homes, Inc.*, 72 N.C. App. 224, 233-34, 324 S.E.2d 626, 632 (citation and quotation marks omitted), *disc. rev. denied*, 313 N.C. 597, 330 S.E.2d 606 (1985). "[A] lien under [N.C. Gen. Stat. §] 44A-8 attaches only for 'debts owing for labor done or professional design or surveying services or material furnished.' Nothing is said about lost profit." *W.H. Dail Plumbing, Inc. v. Roger Baker & Assocs., Inc.*, 78 N.C. App. 664, 667, 338 S.E.2d 135, 137 (quoting N.C. Gen. Stat. § 44A-8), *disc. review denied*, 316 N.C. 71, 345 S.E.2d 398 (1986).

In this case, Signature filed a claim of lien against the Property "in support of its rights to be paid for the work that it did to improve the . . . [P]roperty." The basis of Signature's claim of lien was Sandler's nonpayment of the Participation Fee under provision 4(e) of the Agreement. The Participation Fee provides for payment to Signature of 20% of the "net *profits* . . . realized and distributed by [Sandler] from the sale, financing, refinancing and/or operation of the Project[.]" (Emphasis added). As a materialman's lien under N.C. Gen. Stat. § 44A-8 attaches to property only for debts owing for labor done or professional design or surveying services or material furnished, and not for lost profits, *id.*, there was no debt owing under provision 4(e) which would support the claim of lien. Accordingly, the trial court did not err in striking Signature's claim of lien against the Property.

SIGNATURE DEV. LLC v. SANDLER COMMERCIAL AT UNION, L.L.C.

[207 N.C. App. 576 (2010)]

## D. Attachment

[5] Finally, Signature argues that the trial court erred in dissolving the order of attachment. We agree.

Pursuant to N.C. Gen. Stat. § 1-440.1,

> [a]ttachment is a proceeding ancillary to a pending principal action, is in the nature of a preliminary execution against property, and is intended to bring property of a defendant within the legal custody of the court in order that it may subsequently be applied to the satisfaction of any judgment for money which may be rendered against the defendant in the principal action.

N.C. Gen. Stat. § 1-440.1(a) (2009). "Attachment may be had in any action the purpose of which, in whole or in part, or in the alternative, is to secure a judgment for money . . . ." N.C. Gen. Stat. § 1-440.2 (2009). In actions in which attachment may be had under N.C. Gen. Stat. § 1-440.2, an order of attachment may be issued when the defendant is

> (1) A nonresident, or
>
> (2) A foreign corporation, or
>
> . . . .
>
> (5) A person or domestic corporation which, with intent to defraud his or its creditors,
>
> a. Has removed, or is about to remove, property from this State, or
>
> b. Has assigned, disposed of, or secreted, or is about to assign, dispose of, or secrete [sic], property.

N.C. Gen. Stat. § 1-440.3 (2009).

In addition to the grounds for attachment specified in N.C. Gen. Stat. § 1-440.2,

> in all cases where the owner removes or attempts or threatens to remove an improvement from real property subject to a claim of lien on real property under [Chapter 44A, Article2], without the written permission of the lien claimant or with the intent to deprive the lien claimant of his or her claim of lien on real property, the remedy of attachment of the property subject to the claim of lien on real property shall be available to the lien claimant or any other person.

N.C. Gen. Stat. § 44A-15 (2009).

**SIGNATURE DEV. LLC v. SANDLER COMMERCIAL AT UNION, L.L.C.**

[207 N.C. App. 576 (2010)]

In this case, Signature is seeking a monetary judgment for Sandler's alleged fraud, unjust enrichment, unfair and deceptive trade practices, and breach of contract in connection with Sandler's failure to pay Signature the Participation Fee in accordance with the Agreement. Signature applied for an order of attachment on the Property by filing an Affidavit in Attachment Proceeding. In accordance with N.C. Gen. Stat. § 1-440.3, the affidavit stated as grounds for attachment that Sandler is: (1) "[a] nonresident[;]" (2) "[a] foreign corporation[;]" and (3) "[a] person or domestic corporation which, with intent to defraud his/her or its creditors . . . has removed or is about to remove, property from this state . . . [and] has assigned, disposed of, secreted, or is about to assign, dispose of, or secrete [sic], property."

The trial court found and concluded that

Plaintiff Signature cannot sue for monies owed under provisions 3(a) and (b) of the Development Management Agreement, that it appears that the compensation for these construction/development obligations is described in paragraph 4(a) and (b) of the Agreement, and that Defendant's Motion to Dismiss those claims should be allowed. . . .

. . . [A]ccordingly, the lien placed on the [P]roperty by Plaintiff should be stricken and the *related* attachment order dissolved[.]

(Emphasis added).

As discussed *supra*, the trial court erred in dismissing Signature's claims for breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, fraud, negligent misrepresentation, and unfair and deceptive trade practices based on Sandler's failure to pay the Participation Fee. However, the trial court did not err in striking Signature's claim of lien. Nonetheless, while the trial court's striking of Signature's claim of lien entered pursuant to N.C. Gen. Stat. § 44A-8 would have mandated the dismissal of a *related* order of attachment entered pursuant to N.C. Gen. Stat. § 44A-15, Signature's order of attachment in this case was procured under N.C. Gen. Stat. § 1-440.3 and, thus, was not *related* to the stricken claim of lien.

It is undisputed that Sandler is a limited liability company organized and existing under the laws of the State of Virginia. Accordingly, Sandler is a "[a] foreign corporation" under N.C. Gen. Stat. § 1-440.3. Furthermore, Signature's action based on Sandler's failure to pay the Participation Fee is pending. *See* N.C. Gen. Stat. § 1-440.2 ("Attachment may be had in any action the purpose of which, in whole or in part, or in

the alternative, is to secure a judgment for money . . . ."). Accordingly, the trial court erred in dissolving the Order of Attachment for the reasons it stated and the trial court's order on this issue is reversed.

[6] Wells Fargo asserts, however, that the trial court did not err in dissolving the order of attachment because, as an alternative basis, the trial court could have dissolved the order since the rent proceeds and leases are property of Wells Fargo and were never property of Signature for the purpose of attachment or levy. For the reasons stated below, we remand this issue to the trial court.

> Pursuant to N.C. Gen. Stat. § 1-440.43,
>
> [a]ny person other than the defendant who claims property which has been attached, or any person who has acquired a lien upon or an interest in such property . . . may
>
> (1) Apply to the court to have the attachment order dissolved or modified . . . upon the same conditions and by the same methods as are available to the defendant . . . .

N.C. Gen. Stat. § 1-440.43 (2009). The conditions and methods available to the defendant are as follows:

> (b) When the defect alleged as grounds for the motion appears upon the face of the record, no issues of fact arise, and the motion is heard and determined upon the record.
>
> (c) When the defect alleged does not appear upon the face of the record, the motion is heard and determined upon the affidavits filed by the plaintiff and the defendant, unless, prior to the actual commencement of the hearing, a jury trial is demanded in writing by the plaintiff or the defendant. Either the clerk or the judge hearing and determining the motion to dissolve the order of attachment *shall find the facts upon which his ruling thereon is based.* If a jury trial is demanded by either party, the issues involved shall be submitted and determined at the same time the principal action is tried, unless the judge, on motion of any party for good cause shown, orders an earlier trial or a separate trial.

N.C. Gen. Stat. §. 1-440.36 (2009) (emphasis added).

In this case, Wells Fargo filed its Application pursuant to N.C. Gen. Stat. §§ 1-440.43 and 1-440.36. The basis for the Application was that the rent proceeds and leases were property of Wells Fargo, and, thus, were never the property of Signature for the purpose of attach-

**SIGNATURE DEV. LLC v. SANDLER COMMERCIAL AT UNION, L.L.C.**

[207 N.C. App. 576 (2010)]

ment or levy. The Application, along with Sandler's Motion to Dismiss, was heard on 27 October 2008.

In the Order Partially Granting Sandler's Motion to Dismiss entered 28 January 2009, the trial court stated:

THIS CAUSE COMING ON TO BE HEARD and being heard on October 27, 2008 upon Defendant Sandler Commercial at Union, L.L.C.'S ("Sandler") Motion to Dismiss and Wells Fargo Bank's Application to Dissolve and/or Modify the Order of Attachment; and

IT APPEARING TO THE COURT, having reviewed the materials submitted and hearing argument from counsel the Court concludes that Defendant Sandler's Motion to Dismiss should be partially allowed.

The trial court thereupon found and concluded that

as an unlicensed contractor Plaintiff Signature cannot sue for monies owed under provisions 3(a) and (b) of the Development Management Agreement, that it appears that the compensation for these construction/development obligations is described in paragraph 4(a) and (b) of the Agreement, and that Defendant's Motion to Dismiss those claims should be allowed.

The trial court further found and concluded that

pursuant to this ruling, Plaintiff cannot recover for construction/development claims, that accordingly, the lien placed on the [P]roperty by Plaintiff should be stricken and the related attachment order dissolved . . . .

We have held that the trial court erred in dissolving the attachment order on this basis. Furthermore, the trial court made no findings of fact pursuant to N.C. Gen. Stat. § 1-440.36(c) concerning the issues raised in Wells Fargo's Application.

Although Wells Fargo asserts that the order of the trial court is "unclear as to what grounds upon which it dissolved the Order of Attachment[,]" we conclude that the trial court unequivocally dissolved the Order of Attachment based on Sandler's Motion to Dismiss and did not rule on Wells Fargo's Application. Accordingly, we remand this matter to the trial court for consideration of Wells Fargo's Application.

In sum, for the foregoing reasons, we hold as follows: (1) the trial court's order dismissing Signature's claims under provisions 3(a) and (b) of the Agreement is reversed and this matter is remanded for fur-

ther proceedings on Signature's claims; (2) the trial court's order striking Signature's claim of lien is affirmed; (3) the trial court's order dissolving Signature's order of attachment based on Sandler's motion to dismiss is reversed; (4) the matter is remanded for further proceedings on Wells Fargo's Application to dissolve/modify Signature's order of attachment.

REVERSED IN PART, AFFIRMED IN PART, and REMANDED in part.

Judges McGEE and STEELMAN concur.